# EXHIBIT A

## AFFIDAVIT OF SPECIAL AGENT DAVID X. O'NEILL

I, David X. O'Neill, being duly sworn, do hereby depose and state that:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately twenty years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP"), and special agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies.

2. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

3. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following property:

    a. $68,480 in United States currency seized from Aadrian Evelyn on May 23, 2016, at Boston Logan International Airport (the "Currency").

4. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

5.      This affidavit is based upon my personal knowledge, training, and experience, as well as information provided to me by law enforcement personnel from the LATF and the MSP, and my review of records and reports relating to the investigation.

6.      As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States:

   a. pursuant to 21 U.S.C. § 881(a)(6), because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846[1], proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation; and/or

   b. pursuant to 18 U.S.C. § 2428, because it represents (i) property, real or personal, that was used or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 2421; and/or (ii) property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of a violation of 18 U.S.C. § 2421.[2]

**THE SEIZURE OF THE CURRENCY**

7.      On May 23, 2106, at approximately 3:45 p.m., Transportation Security Administration ("TSA") agents contacted the Massachusetts State Police ("MSP") Logan Airport Desk Officer requesting assistance from the MSP. TSA agents asked that a MSP Trooper respond to the Virgin America TSA passenger screening checkpoint, located on the upper level of Terminal

---

[1] Pursuant to 21 U.S.C. § 841(a), "it shall be unlawful for any person knowingly or intentionally (a) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance; or (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance."

[2] Pursuant to 18 U.S.C. § 2421, a person who "knowingly transports any individual in interstate or foreign commerce, or in a Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both."

B, to investigate a large amount of United States currency found in a passenger's carry-on bag. The passenger was later identified as Aadrian Roberto Evelyn ("Evelyn").

8. On May 22, 2016, Evelyn purchased a one-way airline ticket on Virgin American Airlines, Flight 367, at 5:45 p.m. for travel on May 23, 2016 from Boston, Massachusetts to Los Angeles, California. On May 23, 2016, Evelyn arrived in Boston from Los Angeles at 7:30 a.m., the same day on which he was departing. On May 23, 2016, at 1:44 p.m., Evelyn called the Virgin American Airlines reservation center requesting a first class upgrade for the flight, which cost $399 and for which Evelyn paid with a credit card. For his inbound flight reservation, Evelyn provided a date of birth of January 19, 1984, while for his outbound reservation, he provided a different date of birth of February 5, 1991. For both reservations, Evelyn provided a contact email address of MMOLLY755@gmail.com. Based upon my training and experience, I know that "Molly" is a term used for the drug MDMA.[3] In my training and experience, the nature of Evelyn's travel reservations were suspicious and indicative of drug traffickers and individuals who engage in bulk cash smuggling, because of the short duration of Evelyn's trip, the last-minute nature of his reservations, and the fact that Evelyn provided different dates of birth on his reservations.

9. MSP Trooper Bruce Adams ("Trooper Adams") responded to the TSA checkpoint. When he arrived, a TSA officer directed Trooper Adams to a search table that held Evelyn's carry-on items. The TSA officer handed Trooper Adams a small, black, fabric pouch which contained the Currency from Evelyn's possessions. When Trooper Adams asked Evelyn about the Currency, he said that he was planning to relocate to Cambridge, Massachusetts, and that he brought the Currency with him from California to purchase property. Trooper Adams told Evelyn that he was

---

[3] MDMA is an acronym for its chemical name 3,4-Methylenedioxymethamphetamine, commonly known as "ecstasy."

not under arrest and he was free to leave at any time, and that he was contacting the LATF to speak with Evelyn regarding the Currency. Evelyn stated that he understood and was cooperative.

10. Within a few minutes, I arrived at the TSA checkpoint with MSP Troopers David Walsh ("Trooper Walsh") and Baldwin Leon. Trooper Adams told me about Evelyn's prior statements regarding the Currency. Evelyn was dressed in medical scrubs and standing in a "protective posture," with his arms crossed and looking down at the ground, that indicated to me that he was concerned about the situation. I asked Evelyn questions about the purpose of his travel to Boston, and he began by saying that he was in Massachusetts "looking at property to buy." I asked Evelyn questions related to purchasing property, and Evelyn was unable to provide the names of any local real estate companies or agents with whom he had been in contact, was unable to tell me what cities or towns he was looking in, and was unable to tell me the type of property he was seeking to purchase. During the interview, Evelyn seemed to become more apprehensive, as sweat began to form on his face and forehead, he repeatedly displayed a nervous laugh, and he crossed his arms across his chest most of the time. Evelyn constantly broke eye contact with me, looking at the floor, the ceiling and his surroundings during the interview.

11. After a couple of minutes, Evelyn eventually admitted that he was not in Boston to buy property but was in Boston for "other reasons." I asked him to elaborate, and Evelyn said that he was in Boston to meet with a person to have "relations." Again, I asked him to elaborate, and he responded by making faces and gestures that suggested he meant sexual relations. I told him that I understood, but meeting with a person to have "sexual relations" did not explain why he had such a large amount of currency with him. Evelyn said that he arrived in Boston earlier that day, met an unidentified man named "Jeffrey" (LNU) at an area hotel, and had a sexual encounter with him. Evelyn bragged that he was paid approximately $60,000 to have a single sexual encounter,

and that he had been paid in the past to perform sexual acts. In response, I joked with Evelyn and said that he must possess incredible skills to be paid that amount of money for sex. Evelyn smiled, shrugged his shoulders, and said, "well, yeah."

12. When I asked Evelyn how he met Jeffrey, Evelyn said that three weeks before, he met Jeffrey on a website known as Jack'd.[4] I asked Evelyn if I could see Jeffrey's post on Jack'd, as well as Evelyn's response to Jeffrey. Evelyn politely refused and said that I could download the app and search for Jeffrey myself.

13. I again told Evelyn that it was highly unlikely that someone would pay such a high fee for a single sexual encounter, and that by his own admissions Evelyn was in Boston only for a few hours. Evelyn said that after he arrived at Logan Airport that morning, he went to the Marriot Courtyard hotel in Cambridge, Massachusetts where he had sex with "Jeffrey." After the sexual encounter, he left the hotel and returned to Logan Airport to fly back to Los Angeles. During the conversation, Evelyn continued to hold his arms crossed against his chest in a guarded posture. He continued to visibly sweat and looked in all directions, avoiding eye contact with investigators.

14. During the interview, I noticed that Evelyn possessed what I thought were two cellular telephones. Later, investigators learned that one of the devices was a cell phone, and the other was an iPod electronic data storage device (the "electronic devices"). I asked Evelyn why he had two cell phones, and Evelyn explained that one was for personal use and the other was to communicate with customers related to his "CPR/First Aid" business. Evelyn said that he was a licensed first aid instructor, but when I asked him if he had a physical license to be a CPR/First Aid instructor, he did not answer. I asked Evelyn for his business telephone number, but he was

---

[4] A Google search of Jack'd describes the website as a gay men's chat and dating app/website.

unable to give it to me. I asked him if he had a website for his business, and Evelyn quickly responded by saying, "Of course!" I asked Evelyn if I could see the website, but Evelyn said that the website went "down" last month. When I asked for the website address, Evelyn was unable to provide it to me.

15. A later search of the State of California Secretary of State database revealed that Aadrian Roberto Evelyn had an active incorporated business by the name of AA Medical, Inc., which was filed with the Secretary of State on May 15, 2015. The business address is the same as Evelyn's residential address, and the business telephone number was activated in April 2016.

16. I asked Evelyn if he would show investigators the content on his cell phone. Evelyn immediately agreed and held the phone out to us. Trooper Walsh asked Evelyn about his income status and earnings. Evelyn said that in 2015, he earned approximately $40,000 working as a nurse for the Department of Veterans Affairs in California, and earned another $45,000 teaching and certifying people in CPR. Trooper Walsh asked Evelyn if he filed taxes the previous year, and he replied "yes, of course I did." When asked how he filed the taxes, Evelyn rolled his eyes then turned his head towards the ceiling. Trooper Walsh asked Evelyn if he used the services of a professional accountant and he said that he did. Trooper Walsh asked for the accountant's name, and Evelyn replied "oh my God" while looking up at the ceiling. Trooper Walsh asked Evelyn for the accountant's name again, and Evelyn laughed nervously, shrugged his shoulders upward, and said, "Ron, I don't know his last name."

17. Trooper Walsh continued to ask Evelyn questions about his income, including whether Evelyn belonged to a bank or other financial institution in the State of California. Evelyn laughed and said "yes, of course I do." Trooper Walsh asked Evelyn for the name of the bank, and Evelyn paused, said nothing, rolled his eyes upward towards the ceiling, then said "I'm a

nurse, this is crazy." Trooper Walsh asked again for the name of a bank Evelyn belonged to and Evelyn loudly replied "Wells Fargo." Trooper Walsh asked Evelyn if he used online banking, and Evelyn said that he did. Trooper Walsh asked Evelyn if he was willing to log into his online banking account and simply demonstrate that his online account existed. Evelyn just looked at investigators with a blank stare and said nothing.

18.    We determined that Evelyn had grown tired of the conversation, and formed the opinion that Evelyn was unable to provide answers to very basic questions that people who were not involved in illegal activity could answer. We told Evelyn that we believed the Currency was the proceeds of illegal narcotics activity that required further investigation, and that the Currency was being seized. We reminded Evelyn that he was not under arrest, and offered him a ride back to the Troop F Barracks (the "Barracks") so that the Currency could be counted and he could be provided with a receipt. Evelyn opted to take his flight instead. Trooper Walsh provided Evelyn with his business card containing contact information for the LATF. We left the scene, and Evelyn eventually boarded his scheduled flight.

19.    Trooper Walsh arrived at the Barracks, and requested the State Police K9 Unit respond to the Barracks. Before the K9 Unit arrived, the Currency was placed in a desk drawer on the second floor of the building, out of sight. Approximately one hour later, Trooper Jason Vital ("Trooper Vital") and his canine partner, Rocky, arrived at the Barracks. Trooper Vital has been employed by the MSP for 10 years, and has been assigned to the K9 unit since June of 2012. Rocky is a 6-year-old Belgian Malinois trained in the detection of controlled substances in different situations, including interdiction investigations. Trooper Vital and Rocky attended and successfully completed a 320-hour course in narcotic detection through the New England State Police Administrator's Conference ("NESPAC"). Rocky is certified to detect marijuana, cocaine,

heroin and methamphetamine. Trooper Vital and Rocky attend recertification on a yearly basis. Their most recent certification was completed on May 26, 2016. Since the initial NESPAC accreditation course, Trooper Vital and Rocky have maintained their training at a minimum of 16 hours per month. Searches conducted by Rocky have led to the seizure of marijuana, cocaine, heroin and methamphetamine.

20. When Trooper Vital and Rocky arrived, Rocky was set free to perform a search of the area. Trooper Vital informed investigators that Rocky alerted positive to the odor of narcotics on the Currency in the drawer. The Currency was taken to the Troop F detective unit by Trooper Walsh, where it was counted. The Currency totaled $68,480.00 in the following denominations: 572 $100 bills, 196 $50 bills, and 74 $20 bills. The money was secured with the Troop F Evidence Officer and later deposited in the seized funds account.

## **CONCLUSION**

21. Based on the information set forth above, I have probable cause to believe that the Currency is subject to forfeiture to the United States:

   a. pursuant to 21 U.S.C. § 881(a)(6), because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation; and/or

   b. pursuant to 18 U.S.C. § 2428, because it represents (i) property, real or personal, that was used or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 2421; and/or (ii) property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of a violation of 18 U.S.C. § 2421.

Signed under the pains and penalties of perjury, this 31 day of October, 2016.

_____
David X. O'Neill, Special Agent
United States Drug Enforcement Administration